# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

FILED
U.S. DISTRICT COURT

2009 JUL 15 AM 11: 21

CLERK _____
SO. DIST. OF GA.

STACY JONES TUCKER,       :       CIVIL ACTION

    Plaintiff,         :

v.                    :

GEORGIA DEPARTMENT OF PUBLIC  :
SAFETY and its Division, the
GEORGIA STATE PATROL,     :

DAVID BRACK, individually and :
in his official capacity,

                    :
ROBERT PHILLIPS, individually
and in his official capacity, :

ANDY CARRIER, individually and:
in his official capacity,

                    :
NEIL JUMP, individually and in
his official capacity,    :

KEITH COLLINS, individually  :
and in his official capacity,

                    : .
    Defendants.          NO. CV208-33

## O R D E R

Plaintiff, Stacy Jones Tucker,[1] filed the above-
captioned case against Defendants, the Georgia Department of
Public Safety, and its division, the Georgia State Patrol

---

[1] For the sake of clarity, the Court will refer to Plaintiff as "Tucker"
and her ex-husband as "Robbie Tucker."

(the "State Patrol"), David Brack, Robert Phillips, Andy Carrier, Neil Jump, and Keith Collins, asserting employment discrimination claims, pursuant to Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C. §§ 2000e - 2000e-17, and constitutional claims pursuant to 42 U.S.C. § 1983.

Presently before the Court are Defendants' motions for summary judgment. Defendants' motions will be **GRANTED** in part and **DENIED** in part. Because Plaintiff has pointed to no evidence of intentional discrimination, her disparate treatment claim fails as a matter of law. Because Plaintiff has presented some evidence of an extremely hostile working environment, the State Patrol is not entitled to summary judgment as to her hostile work environment/constructive discharge claim. The Title VII claims are not cognizable against the individual Defendants.

Because (1) Plaintiff has presented sufficient evidence to show that she was constructively discharged based on her marriage, (2) her government employer's right to an efficient workplace did not outweigh her right to continue her marriage, (3) the individual Defendants are not entitled to qualified immunity in their individual capacity, and (4)

2

Tucker may be entitled to reinstatement by those Defendants in their official capacity, the individual Defendants are not entitled to summary judgment on Plaintiff's intimate association constitutional claim. The State Patrol has Eleventh Amendment immunity with respect to the constitutional claim.

## BACKGROUND

Viewing the facts in the light most favorable to Tucker, as the Court must on a summary judgment motion, the facts are as follows. Although what follows appears to be a rather laborious recounting of the facts, the Court finds that this is necessary to explain the Court's legal conclusions.

Tucker had a twenty-year career as a law enforcement official in Georgia. During her deposition, Tucker testified that a career in law enforcement appealed to her when she was in high school, and that she loved her job as a state trooper. It is undisputed that Tucker was great at her job as a trooper. The individual Defendants, Plaintiff's supervisors, had no complaints about her job performance, with one exception, discussed below.

Tucker was from Hinesville, Georgia, and became a state

3

trooper in 1998. During her deposition, Tucker explained the State Patrol's command structure: the Colonel is the Commissioner of the Department of Public Safety and heads the agency. Under the Colonel, there is a Major, a Captain, and Lieutenant, which are the commissioned officer positions. The State Patrol is organized into a number of posts around the state, and within the post structure, there are certain noncommissioned officer positions, including a post commander, sergeant first class, buck sergeant, and a corporal. See Ga. Code Ann. § 35-2-36(b).

The numerous posts around the state are organized into troops. Located within Troop I are the posts in Waycross, Brunswick, Jekyll Island, Hinesville, and Rincon. In each troop, there is a troop command office, and in Troop I, that office is located at the Brunswick post. The troop commander is the Captain, and the Major is above the Captain, with more statewide responsibilities.

Tucker had several different duty stations while working for the State Patrol. After graduating from the academy, Tucker was stationed in Waycross. Plaintiff then took advantage of an opportunity to transfer to the Brunswick post, which was closer to her home in Jesup. In 2002, Tucker

4

transferred from Brunswick to executive security at the Governor's mansion in Atlanta. In January 2004, Tucker transferred to the specialized collision reconstruction team in Reidsville. About six months later, Tucker sought and received a promotion to corporal, and she was stationed on Jekyll Island.

In March 2006, Tucker transferred to Rincon to improve her prospects for further promotion. While stationed in Rincon, around mid-August, Tucker was detached back to Brunswick because a trooper there, Mike Young, was in serious medical condition after a traffic accident. Around the first part of September, Young died. In September 2006, Tucker was promoted to buck sergeant and stationed in Hinesville.

During all relevant times, Sergeant Jump was the post commander in Brunswick, and Sergeant Collins was the post commander in Hinesville. Lieutenant Carrier was the Assistant Troop Commander for Troop I, and was assigned to the Rincon post. In 2006, Brack was Captain and Troop Commander of Troop I. In 2007, Brack was promoted to Major. In 2006, Phillips was a Lieutenant and was the Assistant Troop Commander for Troop I.[2] In January 2007, Phillips

---

[2] In each troop, there are two lieutenants.

5

became Captain and Troop Commander of Troop I.

According to Tucker, her problems at work began shortly after June 2006, when she married Robbie Tucker, who operated a wrecker service and was on a referral list with the State Patrol. Prior to the marriage, Tucker knew that at least one of her supervisors, Phillips, possessed a low opinion of Robbie Tucker, based on a comment that Phillips made to her. During Tucker's deposition, she conceded that her husband was quick-tempered, emotional, and bipolar.

On July 2, 2006, Tucker left her patrol car at the repair shop owned by her father-in-law, Otis Tucker. Otis Tucker also operated a wrecker service on the State Patrol referral list, and his son, Robbie, drove for him at times. Although Tucker did nothing wrong in leaving her patrol car at that shop for a tire repair, several local law enforcement officers arrived on scene and demanded to see Otis Tucker's identification. Following this incident, Brunswick Post Commander Jump attempted to get Tucker in trouble with her superiors regarding this situation, but he was forced to apologize.

On September 4, 2006, which was Labor Day and the day of Trooper Young's funeral, Tucker was stationed in Brunswick

6

temporarily, but was off duty. Tucker rode with her husband onto Jekyll Island on a tow call, which the State Patrol had referred to him. The car in need of towing was not registered, and two Hispanic males were the only people in the car. The driver was intoxicated, and neither man spoke English. While on the scene, Robbie Tucker got into an argument with a woman who was apparently a supervisor of the men, and an employee of the Jekyll Island Authority. During Tucker's deposition, she testified that both her husband and the woman were at fault for the verbal dispute, and that the argument turned ugly.

Thereafter, the woman at the scene made a report to a State Patrolman about the incident, but the trooper refused to take down Robbie Tucker's version of the events. Robbie Tucker found this refusal unfair, and within a couple of days, he went to the Jekyll Island post to protest, where he met with Post Commander Randy Martin and Captain Brack. Instead of getting back with Robbie Tucker about the situation, Brack called Plaintiff on her day off to notify her that they were not going to change the incident report. According to Plaintiff, it was highly unusual for a Captain to contact her personally, outside the chain of command

7

structure, and it was also unusual for the State Patrol to make an incident report with only one side of the story. Tucker reported that, after this incident, her husband was furious and felt mistreated.

Around this time, Brack called Tucker and told her that he was "tired of hearing Robbie Tucker's name," because Jump had been calling Brack daily to ask for permission to take him off the wrecker rotation. Brack told Tucker that her marriage was a mistake and that she needed to "move on."

On September 25, 2006, Robbie Tucker was towing an armored car in Ludowici, heading for Savannah, with $250,000 in the towed vehicle. Robbie Tucker testified that he was in a hurry to reach his destination before closing time, and was apprehensive about having that much money under his control. State Patrol Trooper Middleton pulled the wrecker over for going 72 miles per hour in a 55 miles per hour zone. Robbie Tucker approached the cruiser, and spoke with Middleton. The wrecker driver told Middleton that his wife was Middleton's coworker, and he left without a ticket or a warning.

Robbie Tucker told his wife about the stop. Plaintiff was concerned that the situation did not go as smoothly as

8

AO 72A
(Rev. 8/82)

her husband reported, and she asked Middleton about it. Middleton told her that he had been apprehensive at first, because her husband got out of the wrecker and came up by his cruiser door, but that the stop was otherwise routine and without incident. Upon learning of this report, Robbie Tucker vehemently disagreed that he approached the trooper's door and opened it, and he was determined to be vindicated. Accordingly, he contacted the State Patrol public information office in Atlanta and asked for the video and audio of the stop.

Around October, Tucker began her new assignment in Hinesville as buck sergeant. Before she left for her new assignment, Brack and Jump confronted her at the Brunswick post, and told her that she had made a mistake – she needed to choose between her marriage and her job. Tucker testified that she was devastated, but due to her supervisors' directions, Tucker separated from her husband and moved back to her home in Jesup. After she told Jump that she moved out, he assured her that it was the right thing to do.

Even after the separation, Tucker's supervisors told her that she needed to end her marriage. Although Tucker was hoping for a fresh start in Hinesville, she found that her

AO 72A
(Rev. 8/82)

new supervisor, Collins, had already been refusing to return her husband's calls regarding the Ludowici stop.

On October 16, 2006, Robbie Tucker was at the Barberitos restaurant on St. Simons Island. While there, according to Robbie Tucker, a sixteen year old female employee, who grew up near where Robbie Tucker lived, placed her hands on his arm. He swatted her away with his hands, making contact with her back, or possibly, he conceded, her backside. Robbie Tucker was arrested by local law enforcement and charged with sexual battery – he was accused of grabbing the young lady's buttocks, and "pulling out" her jeans. Robbie Tucker was never prosecuted for this crime, and the statute of limitations has expired.

The following day, Jump was aware of the arrest, and both Robbie Tucker and his father were removed from the wrecker rotation. While Otis Tucker's suspension was temporary, Robbie Tucker's suspension became official and is ongoing. According to the State Patrol documents, Robbie Tucker's suspension was based on his arrest, and his run-ins with the State Patrol in September 2006 on Jekyll Island and in Ludowici. The suspension has proven difficult for Robbie Tucker's business, as his income has dropped by a third since

10

then.

In November, Tucker went to lunch with Carrier, and told him about all the problems she had been experiencing, and he did nothing to correct or prevent the harassment. In December, Tucker told Melissa Rodgers, head of the Georgia State Patrol legal department, that she had been given an ultimatum and told that she need to choose between her marriage and her job. Rodgers told Tucker that her supervisors could not make her make that choice, but did not follow up on the complaint.

In January, the State Patrol contacted Robbie Tucker and told him that the Ludowici tape had been damaged. Plaintiff knew this fact was untrue because the tape was in the evidence room in Hinesville. According to Plaintiff, it was part of her job as buck sergeant to handle public requests for information. Consequently, it was not unusual for Plaintiff to follow up with the Atlanta office about their explanation to her husband, which she did. Tucker thought that it was odd that she had never been contacted to locate and process the request for the tape, but she thought it was possible that the request had gone through Collins because the request involved her husband.

11

AO 72A
(Rev. 8/82)

Thereafter, Tucker asked Collins about the matter. While Collins claimed to know nothing about the problem, he was upset that Tucker had gotten involved in the request. Collins judged this to be a conflict of interest, even though he had refused to give Tucker any guidance about that very issue previously. Collins conducted a corrective interview with Tucker, and made a permanent record of the counseling session, writing a letter of concern for Tucker's file. The letter of concern was dated February 15, 2007. After receiving the letter, Tucker told Collins and Phillips that she was working in a hostile environment, but neither man did anything about it.

In mid-March, Tucker spoke with Troop I's secretary, Pam Lancaster, who shared an office with their superiors in the troop command office in Brunswick. Previously, Lancaster overheard Carrier having a conversation with Brack, wherein Carrier repeated the notion that Tucker had to get a divorce or forget about her career. Lancaster told Tucker that Brack, Carrier, and Phillips had been talking with each other for several months about the fact that Tucker need to choose between her marriage and her job. Upon considering this news, Tucker decided that she had no choice but to resign,

12

given that Brack recently had been promoted to Major and moved to Atlanta, and there was no where she could transfer, and no one she could go to, that could fix the problem.

Accordingly, on March 29, 2007, Tucker wrote a resignation letter that informed her supervisors that she was resigning, effective April 15, 2007, as a result of the hostile work environment she had experienced. Before Tucker left the State Patrol's employ, she met with Colonel Hitchens and Human Resources Director Dan Roach in Atlanta. Tucker told the men about her experience, and the men asked her whether she was considering filing a lawsuit, but they did not offer to correct the problem or ask her to withdraw her resignation.

Although Tucker gave up her job to try to make her marriage work, both she and Robbie Tucker testified at their depositions that they were never able to patch up their relationship after what they had been through with Plaintiff's supervisors at the State Patrol. On July 16, 2008, the couple divorced.

**SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56(c) provides for

13

summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in his favor[,]" United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991)(en banc)(internal quotation marks omitted).

## DISCUSSION

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. §

14

2000e-2(a)(1). "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 25 (1993)(Ginsburg, J., concurring). Because a plaintiff can only sue an employer for employment discrimination, Tucker's Title VII claims against the individual Defendants are not cognizable. Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991).

A plaintiff in an employment discrimination case can prove her claim in a few basic ways: she can show disparate treatment, disparate impact, or a hostile work environment. Other, related theories may also apply, but none of those are relevant here. Tucker asserts disparate treatment and hostile work environment claims. Tucker also asserts a constitutional claim for a violation of her intimate association rights. The Court will consider these claims in turn.

## I. Disparate Treatment Claim

A disparate treatment sex discrimination claim is a

AO 72A
(Rev. 8/82)

claim of intentional discrimination by an employer, causing an adverse employment action to an employee. Hostile animus, intent, or motive need not be shown to prevail on a disparate treatment claim. E.g., Int'l Union v. Johnson Controls, Inc., 499 U.S. 187, 199 (1991). But there is no liability under a disparate treatment theory unless the plaintiff shows that the defendant consciously or deliberately treated her differently because of her sex. Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993); EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1284 (11th Cir. 2000). At least in this Circuit, a "subtle bias" claim based on subconscious cognitive stereotypes is not tenable as a disparate treatment claim. But see Thomas v. Eastman Kodak Co., 183 F.3d 38, 59-61 (1st Cir. 1999); EEOC v. Inland Marine Indus., 729 F.2d 1229, 1236 (9th Cir. 1984).

Under these governing standards, Plaintiff's disparate treatment claim fails as a matter of law. Simply put, there is no evidence that Defendants intentionally treated Plaintiff differently based on her sex. According to Plaintiff, several of the individual Defendants told her repeatedly that she had to choose between her job and her marriage. Reportedly, those Defendants also opined that

16

Plaintiff had "made a mistake" in marrying Robbie Tucker.
Plaintiff contends that her eventual resignation was a
constructive discharge, which qualifies as an adverse
employment action.[3]

In certain, limited circumstances, a plaintiff can
prevail on a "sex plus" theory of disparate treatment. Under
that doctrine, for example, an employer cannot have a policy
against hiring married females or women with preschool aged
children. Phillips v. Martin Marietta Corp., 400 U.S. 542,
544 (1971); Sprogis v. United Air Lines, Inc., 444 F.2d 1194,
1197-98 (7th Cir. 1971); Willingham v. Macon Tel. Publ'g Co.,
507 F.2d 1084, 1091-92 (5th Cir. 1975).[4]

But here, Tucker attempts to stack inference on top of
inference in a way that is justified by neither precedent nor
logic. Plaintiff argues not that the State Patrol had a
policy against married female troopers, but that she suffered
sex discrimination because (1) she was a woman, (2) who was

---

[3] During the relevant time period, Plaintiff endured one disciplinary
action – Collins' corrective interview/letter of concern, which did not
alter the conditions of her employment, or qualify as an adverse
employment action. Davis v. Town of Lake Park, 245 F.3d 1232, 1239
(11th Cir. 2001).

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)
(en banc), the Eleventh Circuit adopted as binding precedent all Fifth
Circuit decisions handed down prior to the close of business on
September 30, 1981.

AO 72A
(Rev. 8/82)

married, (3) to a man whom her supervisors found objectionable. This sort of "sex plus plus" theory is not cognizable as intentional sex discrimination under Title VII. Tucker submits that her supervisors would not have treated a male trooper this way.[5] Yet, that is not the relevant inquiry here, where the plaintiff must show conscious discrimination based on sex. The Court concludes that Tucker's disparate treatment claim fails as a matter of law.

## II. Hostile Work Environment Claim

> When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," . . . that is "sufficiently severe or

---

[5] Plaintiff states that Defendants' "you must choose" instructions are direct evidence of discrimination. The Court disagrees. As explained, inference must be stacked upon inference to get to that conclusion. Additionally, Plaintiff does not posit that these statements were tied to any sort of official action which resulted in her termination. "Direct evidence of discrimination is evidence, that, if believed, proves the existence of a fact in issue without inference or presumption. As our precedent illustrates, direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).

It is also doubtful that Tucker could establish a prima facie case based on circumstantial evidence of sex discrimination under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), given that Plaintiff has failed to identify any male troopers whose spouses, family members, or intimate associates were found to be objectionable by State Patrol supervisors (or who were similar in some material way to her husband). Having identified no "comparators," Plaintiff would be hard pressed to overcome the general requirement that she was treated differently than a similarly situated individual of the opposite sex. Holifield v. Reno, 115 F.3d 1555, 1563 (11th Cir. 1997).

AO 72A
(Rev. 8/82)

> pervasive to alter the conditions of the victim's
> employment and create an abusive working
> environment," . . . Title VII is violated.
> This standard . . . takes a middle path between
> making actionable any conduct that is merely
> offensive and requiring the conduct to cause a
> tangible psychological injury.

Harris, 510 U.S. at 21 & 23 (quoted sources omitted).

> [W]hether an environment is 'hostile' or
> 'abusive' can be determined only by looking at
> all the circumstances. These may include the
> frequency of the discriminatory conduct; its
> severity; whether it is physically threatening or
> humiliating, or a mere offensive utterance; and
> whether it unreasonably interferes with an
> employee's work performance.

Id. at 23. No single factor is determinative. Id.

The State Patrol argues that the individual Defendants'

conduct was not based on Plaintiff's sex, but on her

relationship with the owner of wrecker service on the State

Patrol wrecker referral list who caused repeated problems,

resulting in his suspension from the list. The State Patrol

also submits that Plaintiff's supervisors' statements were

welcome, innocuous, and isolated. Plaintiff rejoins that

there is a jury question as to each of these points, and

notes that her supervisors' comments caused her to separate

from her husband in despair, and that she complained to the

individual Defendants about this conduct repeatedly.

The incident involving Otis Tucker occurred on July 2,

19

2006, but Plaintiff contends that it was not recognized as harassment based on Plaintiff's marriage at the time. The Jekyll Island incident occurred on or about September 4, 2006. Brack's first call to Plaintiff was on or about September 6, 2006. It was not until this time, Plaintiff submits, that she realized that she and her husband were being harassed based on their marriage by her supervisors. Plaintiff resigned by letter dated March 29, 2007, after learning from Lancaster that Brack, Phillips, and Carrier had been confirming to each other for four to five months that Tucker had to choose between her marriage and her job. The relevant period is about seven to nine months – from July or September 2006 through March 2007.

Plaintiff insists that her supervisors' statements were of a continuing nature, expressing her obligation to give up her marriage or her job. Plaintiff contends that the remarks were frequent and severe: she was victimized by every male in her chain of command – Major, Captain, both Lieutenants, and two Post Commanders – for exercising her fundamental right to marry. Plaintiff asserts that each mistreatment of her husband, contrary to State Patrol protocol, contributed to her intolerable working conditions. Tucker maintains that

20

each time her complaints were ignored, the working environment became more unbearable. Plaintiff declares that there is no justification for her government supervisors to require her to forgo her fundamental right to be married as a condition of continued employment. According to Tucker, these acts and omissions together constitute a constructive discharge.

Plaintiff testified that she felt like the harassment probably impacted her ability to do her job, in that it took an emotional toll on her. In February 2007, Tucker went to see an employer-provided counselor, Kathy Webb, about her workplace problems. Tucker told Webb that Phillips and Jump disliked her husband and were upset that she was married to him. Tucker decided to quit meeting with Webb based on her concern that her meetings with Webb might not be held confidential from her employer and supervisors.

Plaintiff asserts that, given the male-dominated, quasi-military tradition of the State Patrol, a jury could reasonably conclude that the statements and conduct of her superiors amounted to sexual harassment. A police officer is "part of a quasi-military organization." Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000).

AO 72A
(Rev. 8/82)

Tucker was compelled to obey all lawful orders or instructions from her superiors by State Patrol rules. Dkt. No. 61, Ex. B, Georgia Department of Public Safety Policy Manual ¶ 3.01.4(A)(2). In this context, the instructions from her supervisors to choose between her marriage and her job could be seen by a reasonable jury as being especially coercive and particularly harassing.

Tucker "presents a 'worse case' harassment scenario, harassment ratcheted up to the breaking point." Pa. State Police v. Suders, 542 U.S. 129, 147-48 (2004).

> Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. . . . The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?

Id. at 141.

Considering all the circumstances of this case, weighed against the details described in relevant governing precedents, the Court concludes that a reasonable jury could find that Tucker experienced a constructive discharge. Akins v. Fulton County, 420 F.3d 1293, 1301-02 (11th Cir. 2005); Downey v. S. Natural Gas Co., 649 F.2d 302, 305 (5th Cir. June 1981); Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d

22

1208, 1232-34 (11th Cir. 2001); EEOC v. Massey Yardley Chrysler Plymouth, 117 F.3d 1244, 1247-48 (11th Cir. 1997); Morgan v. Ford, 6 F.3d 750, 756 (11th Cir. 1993); Brochu v. City of Riviera Beach, 304 F.3d 1144, 1161 (11th Cir. 2002). Contrary to Defendants' argument, Plaintiff testified that she made innumerable complaints about her hostile work environment, but that her supervisors, and Rodgers, did nothing to correct or prevent the abuse. An employee's attempt to correct the problem, and a lack of any meaningful response, properly factors in to the constructive discharge analysis.

In Suders, the Supreme Court recognized that a hostile work environment can, in some cases, be so intolerable as to create a constructive discharge, which qualifies as an adverse employment action. Suders, 542 U.S. at 148. Where the constructive discharge is not precipitated by an official action of the employer, the defendant may establish an affirmative defense to vicarious liability. In this context, an "official act" is something in the nature of a serious demotion, pay cut, or a hardship transfer. Id. at 134.

Plaintiff does not maintain that any official act, as delineated in Suders, preceded her resignation/constructive

AO 72A
(Rev. 8/82)

discharge. Therefore, the State Patrol is entitled to assert the affirmative defense to liability set out in the Supreme Court's 1998 decisions <u>Faragher</u> and <u>Ellerth</u>. <u>Id.</u> at 148. To prevail, the employer must show (1) that it used "reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) that the employee acted unreasonably in failing to avail herself of the employer's preventive and corrective opportunities. <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998).

> An employer may, for example, have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so.

<u>Id.</u> at 806-07.

The State Patrol argues that, with respect to all the conduct complained about by Tucker, it exercised reasonable care to prevent harassment and to eliminate it when it occurred, and that Tucker failed to act with reasonable care to take advantage of the employer's established safeguards. The State Patrol notes that it had an anti-harassment policy,

24

which provides that

> Employees who believe they have been subject to sexual or other unlawful harassment, or believe they have witnessed such conduct, must report this immediately to their immediate supervisor, other supervisors in the chain of command, the Colonel, the Lt. Colonel, the Commanding Officer, the Human Resources Adjutant, the Chief of [the Motor Carrier Compliance Division], or the Director of Special Investigations.

Dkt. No. 51, Ex. J, Tucker Dep., Ex. 5, Georgia Department of Public Safety Policy Manual ¶ 5.01.7(A).

The State Patrol argues that, by reporting the harassment to people who were allegedly involved in the harassment, Plaintiff unreasonably failed to take advantage of any opportunity to fix the problem, and suggests that she should have reported the harassment to others outside of the chain of command. However, the policy does not allow employees to report violations outside of an employee's chain of command. Alternatively, the State Patrol posits that the report to Melissa Rodgers, Director of Legal Services, was insufficient because Rodgers was not designated by the policy to receive complaints. Notably, though, according to the letter Dan Roach sent to Tucker after her resignation, Rodgers was "specifically identified in the unlawful harassment prevention policy as a point of contact." Tucker

AO 72A
(Rev. 8/82)

Dep. Ex. 4. This letter provides some evidence that Tucker's attempt to correct the problem through Rodgers was reasonable.

Plaintiff asserts that the individual Defendants saw and heard the other individual Defendants harass her, and failed to report it, as they were required to do under the policy. In October 2006, Brack and Jump called Tucker into Jump's office and told her that her marriage was a mistake and that she would have to choose between her job and her marriage. Neither reported the other's harassment.

Plaintiff asserts that, in November 2006, Plaintiff gave a complete report of her supervisors' conduct to Carrier, and told him that the conduct created a hostile environment. Carrier did not report Brack or Jump, or do anything about the problem, contrary to the policy. In December 2006, Tucker told Collins the same story, including her report to Carrier. Collins reported none of the other Defendants, and did nothing about the problem. Plaintiff further reported the problem to Rodgers in December 2006. Rodgers did not make a report or conduct any investigation.

On February 15, 2007, Collins gave Tucker a letter of concern, and discussed it with her. Tucker told him that she

AO 72A
(Rev. 8/82)

was working in a hostile environment, and he did nothing. Plaintiff protested the letter to Phillips and complained about the harassment, but Phillips also took no corrective action.

Plaintiff insists that each time Brack, Phillips, Carrier, and Jump told Tucker to choose between her job and her marriage during the six months before she was constructively discharged, they were harassing her, even if they thought they were helping. Tucker submits that the State Patrol's policy is not a defense because these men, and Collins, did not act in a reasonably prompt manner to correct or prevent the harassment after she complained. Plaintiff contends that Defendants' failure to respond to her complaints led to her constructive discharge.

On March 30, 2007, Roach invited Tucker to contact him about her complaints of sexual harassment in her resignation letter. On April 12, 2007, Plaintiff met with Roach and Colonel Hitchens. Plaintiff explained her complaints at that time, but Tucker reports that neither man offered to investigate or correct the problem, nor asked her to withdraw her letter of resignation. Plaintiff asserts that they just wanted to find out if she was going to sue. Under

27

circumstances such as those recounted by Tucker, an employee's failure to establish perfect compliance with an internal complaint procedure may be reasonable. <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1314 (11th Cir. 2001).

In summary, considering all the incidents together, there is some evidence that supports Tucker's contention that the harassment was ongoing and sufficiently severe so as to unreasonably interfere with Tucker's work performance. Whether the State Patrol took reasonable care to prevent and correct harassment is a question for the trier of fact. <u>Miller v. Kenworth of Dothan Inc.</u>, 277 F.3d 1269, 1279-80 (11th Cir. 2002). Whether Tucker unreasonably failed to use the complaint procedure is also a question of fact. <u>Breda v. Wolf Camera & Video</u>, 222 F.3d 886, 890 (11th Cir. 2000). The employer is not entitled to summary judgment on the hostile work environment/constructive discharge claim.

## III. Intimate Association Claim

Under the Constitution, a person has a fundamental right to marry, and the state cannot unduly interfere with that intimate relationship. The constitutional source of this

28

right has been traced to the First Amendment's right of association, and the Fourteenth Amendment's guarantee that the state may not take a person's liberty without due process of law. See Adler v. Pataki, 185 F.3d 35, 42-44 (2d Cir. 1999). "[I]t is not necessary that the governmental act require the abandonment or dissolution of a marriage relationship as the price for retaining public employment. The right of association is violated if the action constitutes an 'undue intrusion' by the state into the marriage relationship." Adkins v. Bd. of Educ., 982 F.2d 952, 956 (6th Cir. 1993)(citing Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984)).

Title 42, United States Code, Section 1983, a codification of part of the Ku Klux Klan Act of 1871, allows individuals to sue state actors in federal court for constitutional violations. Monroe v. Pape, 365 U.S. 167, 175-84 (1961), overruled on other grounds by Monell v. Dep't of Soc. Servs., 436 U.S. 658, 663 (1978).

The Eleventh Amendment provides immunity to the several states against federal claims brought in federal court: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or

29

AO 72A
(Rev. 8/82)

prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."   U.S. Const. amend. XI.

Notwithstanding the express language of the Amendment, the doctrine of sovereign immunity has been interpreted to protect a state from suit by its own citizens as well.   <u>Hans v. Louisiana</u>, 134 U.S. 1, 13 (1890).   As a remnant of pre-ratification sovereignty, sovereign immunity extends only to states and entities that act as "arms" of the states.   <u>Alden v. Maine</u>, 527 U.S. 706, 713 (1999).   It is beyond dispute that the Georgia Department of Public Safety, and its division, the State Patrol, is an arm of the state. Accordingly, it is immune from the constitutional claim under the Eleventh Amendment.[6]   Thus, the Court will consider Plaintiff's constitutional claims against the individual Defendants, in their individual capacity, and then in their official capacity, below.

The individual Defendants concede, as they must, that Plaintiff possessed a constitutional right of intimate association in her marriage.   On a motion for summary

---

[6] Congress validly abrogated the sovereign immunity of the several states with respect to Title VII claims pursuant to its authority under section five of the Fourteenth Amendment.   <u>Crum v. Alabama</u>, 198 F.3d 1305, 1317 (11th Cir. 1999).

judgment, the Court must view the evidence in the light most favorable to Plaintiff. Tucker's evidence, if believed, establishes that she was constructively discharged because her supervisors did not like her husband. There is no indication that her husband's work as a wrecker operator interfered with her job performance. Plaintiff was told to choose between her marriage and her job. Distraught, Tucker separated from her husband. When Plaintiff's supervisors were still not satisfied, she resigned. According to Plaintiff and Robbie Tucker, though, the damage was done. The wounds inflicted by Plaintiff's supervisors did not heal. Ultimately, Plaintiff lost her job and her marriage.

The Court applies the <u>Pickering</u> balancing test to intimate association claims, recognizing that the government is entitled to much more deference when it interferes with its employees' First Amendment interests than when it impedes a private citizen's First Amendment rights as sovereign. <u>Shahar v. Bowers</u>, 114 F.3d 1097, 1102 (11th Cir. 1997)(en banc); <u>see</u> <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968). Under the <u>Pickering</u> balancing test, the Court weighs the employee's interest in exercising her constitutional right against the employer's interest in an efficient and

31

effective workplace. <u>Shahar</u>, 114 F.3d at 1112 (Tjoflat, J., specially concurring).

If Plaintiff's evidence is credited, the <u>Pickering</u> balancing test weighs in her favor. On the employee's side of the scale, the right to marry, and not have the state unduly interfere with that relationship, is a fundamental, substantial right. The right to sustain the marital relationship is at the core of the intimate association right implicit in the First Amendment. <u>Parks v. City of Warner Robins</u>, 43 F.3d 609, 615 (11th Cir. 1995); <u>Roberts</u>, 468 U.S. at 617-20. It is not the sort of relationship a government employer should impede based on certain supervisors' dislike of the employee's spouse. The employee's interest is weighty.

Meanwhile, the employer's interest is less clear in this situation. The Eleventh Circuit has been confronted with several cases where the employee's association rights could have some impact at the plaintiff's workplace. <u>Shahar</u>, 114 F.3d 1097; <u>McCabe v. Sharrett</u>, 12 F.3d at 1562; <u>Ross v. Clayton County</u>, 173 F.3d 1305, 1310-11 (11th Cir. 1999). This is not such a case.

AO 72A
(Rev. 8/82)

In _Shahar_, the plaintiff had worked for the summer in the Georgia Attorney General's office, and was offered a job as a staff attorney working on death penalty appeals. Shahar was a lesbian, and she had a commitment ceremony, which she referred to as a marriage, in South Carolina. The Eleventh Circuit assumed, without deciding, that Shahar's homosexual relationship was protected by the First Amendment right of intimate association. Nonetheless, the court found that the employer's interest in an efficient workplace outweighed any constitutional association rights possessed by Shahar. Significant in that determination was the Attorney General's duty to defend, and past history in defending, Georgia's laws against sodomy. _See_ _Bowers v. Hardwick_, 478 U.S. 186 (1986). The _Shahar_ court recognized that Bowers might have a credibility problem enforcing such laws if he declined to revoke the employment offer to Shahar in the wake of her publicized "Jewish, lesbian-feminist, out-door wedding." 114 F.3d 1107 & 1110.

In _McCabe_, the police chief transferred his secretary to a less important job in the city recreation department because she was married to an officer under his command. The court recognized that "it is clear that loyalty and the

33

ability to keep confidences are required for proper performance of McCabe's former job." 12 F.3d at 1572. The Pickering balancing test weighed in the employer's favor, even though there had been no actual breach of confidence by the secretary. The police chief was entitled to a secretary without loyalties to a husband who was a member of the force, which could undermine the police chief's trust. Id. at 1570-73.

Nor is this a case like Ross, where a county correctional officer shared an apartment with his brother, who was on probation for failing to pay his child support. Such a living arrangement was not allowed under the employer's rules, and the plaintiff was demoted as a result. Compared with the marital right at issue in McCabe and here, the plaintiff's right to live with his probationer brother was weak. Ross, 173 F.3d at 1312 n.12. Moreover, "a requirement of a showing of actual disruption would be overly burdensome to the public employer." Id. at 1311. The Pickering balancing test tilted in favor of the employer in Ross because an employee was permitted to seek a special exemption from the rule, which the plaintiff failed to do. Id. at 1312.

34

AO 72A
(Rev. 8/82)

In contrast, Plaintiff's claim is more analogous to _Williams v. Roberts_, 904 F.2d 634, 638 (11th Cir. 1990). In _Williams_, an employee speech case, the plaintiff was terminated based on certain editorials she wrote in a Fulton County governmental newsletter. In performing the _Pickering_ balancing test, the court found that

> There is not a shred of evidence in the record that her speech impeded her ability to do her work, disrupted her working relationships, interfered with the operation of the tax department, threatened Roberts' authority to run his office, resulted in any internal discipline problem, affected the morale of her fellow employees, or created any disrespect for the Tax Commissioner.

_Id._ at 638.

"An employer's purely subjective fear of disruption is insufficient to outweigh an employee's exercise of her rights." _McCabe_, 12 F.3d at 1572. Likewise, the Court finds that there was no reasonable fear of disruption at the State Patrol based on Plaintiff's marriage to Robbie Tucker.

The Court has considered Plaintiff's evidence as to each individual Defendant, and finds that there is sufficient evidence that each man unduly interfered with Plaintiff's marriage. First, Tucker asserts that four of the five Defendants (Phillips, Jump, Brack, and Carrier) told her that

35

she needed to choose between her job and her marriage, which is a blatant and unwarranted intrusion into that intimate relationship. Although there is other evidence of interference by these men, that evidence alone, if believed, could support a jury finding of a First Amendment violation.

Second, there is some evidence that Collins could also be liable. According to Plaintiff, Collins told her that she should not be seen in public with Robbie Tucker, even though they were married, but separated, at the time. Tucker contends that Collins also advised Plaintiff to cancel her plans to spend Christmas in Dallas with her husband. Additionally, Collins had a corrective interview with Tucker about a supposed conflict of interest, although Tucker maintains that Collins had refused to answer her inquiries about what constituted a conflict of interest involving her dealings with her husband's business. If Tucker's testimony is credited, Collins knew about the other supervisor's harassment, and did nothing about it. Tucker also contends that Collins refused to return her husband's phone calls, even though that was contrary to State Patrol policy after Governor Perdue was elected. There is sufficient evidence

AO 72A
(Rev. 8/82)

to hold Brack, Phillips, Carrier, Jump, and Collins liable for interfering with Plaintiff's intimate association rights.

Yet, when suing a government official in his personal capacity, it is not enough to show that a claim can survive summary judgment. The plaintiff must also demonstrate that the law was clearly established at the time of the averred violation. Foy v. Holston, 94 F.3d 1528, 1532 (11th Cir. 1996). Thus, "the salient question . . . is whether the state of the law in [2006] gave [Defendants] fair warning that their alleged treatment of [Tucker] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

The Court has cautioned against requiring that the prior law be clearly established in cases with "fundamentally similar" factual scenarios. United States v. Lanier, 520 U.S. 259, 270-71 (1997). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope, 536 U.S. at 741.

> "[C]learly established" for purposes of qualified immunity means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but is to say that in light of pre-existing law the unlawfulness must be apparent."

37

<u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)(citations omitted).

A reasonable government official working for the Georgia State Patrol had fair warning of the Supreme Court precedents recognizing the right of intimate association as a protected interest under the First Amendment. <u>See</u>, <u>e.g.</u>, <u>Bd. of Dirs. of Rotary Int'l v. Rotary Club</u>, 481 U.S. 537, 545-46 (1987). It also would have been readily apparent in 2006 that the marital relationship is at the core of the interests that are protected by that right. <u>Roberts</u>, 468 U.S. at 618-20. <u>Roberts</u>, and its progeny, served as fair warning that constructively discharging Tucker by telling her that she had to give up her marriage as a condition of keeping her job, <u>inter alia</u>, would violate the law. That such a claim is relatively unusual is not fatal, as the right is obvious and the intrusions, if true, blatant. <u>Hope</u>, 536 U.S. at 741.

Because the unlawfulness of this kind of vindictive constructive termination should have been obvious, qualified immunity does not shield the individual Defendants from liability for Plaintiff's intimate association claims in

38

their individual capacities.[7] If Tucker's evidence is believed, Brack, Phillips, Carrier, Jump, and Collins should have known that their conduct unduly intruded upon, indeed ultimately ruined, Tucker's marriage, and that such conduct was unlawful.

With respect to the individual Defendants' liability in their official capacity, Plaintiff seeks only prospective equitable relief. The individual Defendants agree that such relief is available, but not under the facts presented here. Quern v. Jordan, 440 U.S. 332, 337 (1979); Edelman v. Jordan, 415 U.S. 651, 667-69 (1974); Ex parte Young, 209 U.S. 123, 159-60 (1908). A suit naming a government official in his official capacity is in essence a suit against the governing entity itself. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).

---

[7] Tucker raises certain retaliation claims in her brief in opposition to Defendants' motions for summary judgment. As the individual Defendants have conceded, Plaintiff's claim that she was retaliated against for continuing to be married was pled in her complaint and is fairly before the Court. Dkt. No. 89 at 13 n.16. However, Tucker did not raise any independent retaliation claim in her complaint, and her assertions in her opposition papers that she has independently actionable retaliation claims based on the letter of concern and Defendants' failure to investigate her complaints must fail. Plaintiff cannot raise new claims in this manner at the summary judgment stage. Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004).

AO 72A
(Rev. 8/82)

Plaintiff seeks reinstatement, and wants to prevent Defendants from harassing her about her marriage if she is reinstated. The individual Defendants argue that the issue is moot because Plaintiff is no longer married to Robbie Tucker. If Plaintiff obtains equitable relief in the nature of reinstatement, she would be able to file a separate lawsuit if she suffers further harassment or retaliation. Because an adequate remedy at law exists, the Court will not entertain the proposed injunctive relief suggested by Plaintiff.

## CONCLUSION

For the reasons explained above, Defendants' motions for summary judgment are **GRANTED** in part, and **DENIED** in part. Dkt. No. 51 & 61. Plaintiff's disparate treatment claim fails as a matter of law. Genuine issues of material fact remain in dispute as to Tucker's hostile work environment/constructive discharge claim against the Georgia Department of Public Safety. Plaintiff's Title VII claims are not cognizable against the individual Defendants.

Genuine issues of material fact remain in dispute as to Plaintiff's intimate association claim against the individual

AO 72A
(Rev. 8/82)

Defendants, but if Plaintiff's proof is credited, those Defendants violated clearly established law and Plaintiff would be entitled to reinstatement. Plaintiff's intimate association claim against the Georgia Department of Public Safety is barred by sovereign immunity.

**SO ORDERED**, this __15th__ day of July, 2009.

_____
JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

'2A
8/82)